IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS, AMERICAN TRUCKING
ASSOCIATIONS, INC., a trade
association, and CONSUMER ENERGY
ALLIANCE, a trade association,

       Plaintiffs,

    v.

JANE O'KEEFFE, ED ARMSTRONG,
MORGAN RIDER, COLLEEN JOHNSON,
and MELINDA EDEN, in their
official capacities as members
of the Oregon Environmental
Quality Commission; DICK PEDERSON,
JONI HAMMOND, WENDY WILES, DAVID
COLLIER, JEFFERY STOCUM, CORY-ANN
WIND, LYDIA EMER, LEAH FELDON,
GREG ALDRICH, and SUE LANGSTON,
in their official capacities as
officers and employees of the
Oregon Department of Environmental
Quality; ELLEN ROSENBLUM, in her
official capacity as Attorney
General of the State of Oregon;
and KATE BROWN, in her official
capacity as Governor of the State
of Oregon,

       Defendants,

    v.

CALIFORNIA AIR RESOURCES BOARD,
STATE OF WASHINGTON, OREGON
ENVIRONMENTAL COUNCIL, INC.,
CLIMATE SOLUTIONS, NATURAL
RESOURCES DEFENSE COUNCIL,
ENVIRONMENTAL DEFENSE FUND, and
SIERRA CLUB,

       Defendant-Intervenors.

Case No. 3:15-cv-00467-AA
OPINION AND ORDER

AIKEN, Chief Judge:

Defendants Jane O'Keeffe, Ed Armstrong, Morgan Rider, Colleen Johnson, Melinda Eden, Dick Pederson, Joni Hammond, Wendy Wiles, David Collier, Jeffrey Stocum, Cory-Ann Wind, Lydia Emer, Leah Feldon, Greg Aldrich, Sue Langton, Ellen Rosenblum, and Kate Brown move to dismiss plaintiffs American Fuel and Petrochemical Manufacturers, American Trucking Associations, Inc., and Consumer Energy Alliance's claims pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). Defendant-intervenors California Air Resources Board and the State of Washington (collectively "State Intervenors") separately move to dismiss plaintiffs' complaint with prejudice. Defendant-intervenors Oregon Environmental Council, Inc., Climate Solutions, Natural Resources Defense Council, Environmental Defense Fund, and Sierra Club (collectively "Conservation Intervenors") also move for judgment on the pleadings under Fed. R. Civ. P. 12(c).[1] For the reasons set forth below, defendants' and defendant-intervenors' motions are granted, and this case is dismissed.

## BACKGROUND

In 2007, the Oregon legislature found that climate change seriously threatened Oregon's economy, environment, and public health. Or. Rev. Stat. § 468A.200. These threats included

---

[1] Defendant-intervenors' arguments in favor of dismissal are analogous to those asserted by defendants. Except where otherwise indicated, the Court will address defendant-intervenors' and defendants' motions together.

"[r]educed snowpack, changes in the timing of stream flows, extreme or unusual weather events, rising sea levels, increased occurrences of vector-borne diseases and impacts on forest health." Id. Such environmental damage would "have detrimental effects on many of [Oregon's] largest industries, including agriculture, wine making, tourism, skiing, recreational and commercial fishing, forestry and hydropower generation." Id. The Oregon legislature identified a need to assess and monitor the current level of greenhouse gas emissions ("GHG") in Oregon, "and to take necessary action to begin reducing greenhouse gas emissions in order to prevent disruption of [Oregon's] economy and quality of life and to meet [Oregon's] responsibility to reduce the impacts and the pace of global warming." Id.

In 2009, the state resolved to lower GHG emissions from transportation fuels, which, at 30%, account for the largest single market share. Compl. ¶ 30; Or. Admin. R. 340-253-0000(1). Specifically, via House Bill 2186, the Oregon legislature instructed the Oregon Environmental Quality Commission ("EQC") to adopt rules to decrease lifecycle GHG emissions from transportation fuels, based on their carbon intensities, that are produced in or imported to Oregon by 10% over a 10-year period ("Oregon Program").[2] Compl. ¶¶ 30-31; Or. Admin. R. 340-253-0000(2)-(3).

_____

[2] Lifecycle GHG emissions are the "aggregated quantity of [GHG] emissions, including direct emissions and significant indirect emissions, such as significant emissions from changes in land use associated with the fuels; [m]easured over the full fuel

In 2010, the Department of Environmental Quality ("DEQ") convened an advisory committee to help design a program consistent with House Bill 2186. Compl. ¶¶ 30-31. In January 2011, the DEQ published a final report outlining the advisory committee's process and recommendations. Id. at ¶ 33. In December 2012, the EQC adopted Phase 1 rules for the Oregon Program. Id. at ¶ 34. Phase 1 began on January 1, 2013, when the state began requiring regulated parties - i.e. "[a]ll persons that produce in Oregon or import into Oregon any regulated fuel"[3] - to register for the Oregon Program and record/report the volumes and carbon intensities of their transportation fuels. Or. Admin. R. 340-253-0100(1), 340-253-0200, 340-253-0500, 340-253-0600-50.

In January 2015, after the DEQ convened a second advisory committee, the EQC adopted Phase 2 rules. Compl. ¶¶ 35, 37. These rules require regulated parties to meet the annual clean fuel standards. Or. Admin. R. 340-253-0100-250, 340-253-0400,

---

lifecycle, including all stages of fuel production, from feedstock generation or extraction, production, distribution, and combustion of the fuel by the consumer; and [s]tated in terms of mass values for all [GHGs] as adjusted to CO2e to account for the relative global warming potential of each gas." Or. Admin. R. 340-253-0040(37). "Carbon intensity," in turn, is "the amount of lifecycle [GHG] emissions per unit of energy of fuel expressed in grams of carbon dioxide equivalent per megajoule (gCO2e per MJ)." Or. Admin. R. 340-253-0040(9).

[3] The Oregon Program contrasts "regulated fuel," which is essentially any traditional fuel such as gasoline or diesel, with "clean fuel," which is defined as any "transportation fuel with a carbon intensity value lower than the clean fuel standard for gasoline or diesel fuel and their substitutes." Or. Admin. R. 340-253-0200.

340-253-8010-20. The carbon intensity of a fuel is based on OR-GREET, a lifecycle emissions model developed by the Argonne National Laboratory and customized for Oregon. Or. Admin. R. 340-253-0040(44). The Oregon Program regulations include lookup tables that list the carbon intensities of a variety of fuels.[4] Or. Admin. R. 340-253-8030-40.

Beginning in 2016,[5] regulated parties will need to hold credits equal to or greater than their deficits, on an annual aggregate basis, to demonstrate their compliance with the Oregon Program. Or. Admin. R. 340-253-8010-20. A clean fuel credit is generated when fuel is produced, imported, dispensed, or used in Oregon and the carbon intensity value is lower than the clean fuel standard for that year. Or. Admin. R. 340-253-1000(5). Conversely, a clean fuel deficit is generated when fuel is produced, imported, dispensed, or used in Oregon and the carbon intensity value exceeds the clean fuel standard for that year. Or. Admin. R.

---

[4] These tables, in part, represent default values that "incorporate . . . average [carbon intensities] for producers within [a] region that use the same mechanical methods and thermal-energy source and produce the same co-product." Rocky Mountain Farmers Union v. Corey, 730 F.3d 1070, 1093 (9th Cir. 2013), reh'g denied en banc, 740 F.3d 507 (9th Cir.), cert. denied, 134 S.Ct. 2875, 134 S.Ct. 2884 (2014). Other rows represent individualized carbon intensity values for particular fuel pathways. See, e.g., Or. Admin. R. 340-253-8030 (Table 3). Regulated parties are instructed to use the carbon intensity value for the fuel that "best matches the description in the fuel pathway" in the lookup tables. Or. Admin. R. 340-253-0400(2).

[5] In March 2015, Governor Brown signed Senate Bill 324, which removed the sunset date for the Oregon Program and allowed DEQ to continue its implementation efforts. Compl. ¶ 38.

340-253-1000(6). Credits can be bought and sold, banked for the future, or used by a fuel importer or producer to offset a deficit created by the importation or production of other fuels. Or. Admin. R. 340-253-1050. This structure allows regulated parties flexibility in complying with the Oregon Program, as no regulated party is required to sell any particular fuel or blend of fuels with a certain carbon intensity or origin.

On March 23, 2015, plaintiffs filed a complaint in this Court alleging that the Oregon Program: (1) discriminates against out-of-state commerce in violation of the Commerce Clause; (2) regulates extraterritorial activity in violation of the Commerce Clause and principles of interstate federalism; (3) is expressly preempted by section 211(c) of the Clean Air Act ("CAA") and the Environmental Protection Agency's ("EPA") Reformulated Gasoline Rule ("RFGR"); and (4) is conflict preempted by section 211(o) of the CAA, which contains the Renewable Fuel Standard ("RFS") as amended by the Energy Independence and Security Act ("EISA").[6] In June 2015,

---

[6] The Oregon Program is comparable to California's Low Carbon Fuel Standard ("LCFS"). Compare Cal. Code Regs. tit. 17, §§ 95480-90, with Or. Admin. R. 340-253-0000-8080. In fact, it is undisputed that the Oregon Program was modeled after the LCFS and is analogous thereto in all relevant respects. Pls.' Resp. to Mots. 3-5, 25; see also State Intervenors' Mot. Dismiss 2-4 (detailing the similarities between each program). The LCFS was recently challenged by several farming and fuel associations, including plaintiffs, on many of the same grounds. See generally Rocky Mountain, 730 F.3d 1070; Rocky Mountain Farmers Union v. Goldstene ("Rocky Mountain II"), 2014 WL 7004725 (E.D.Cal. Dec. 11, 2014); Am. Fuels & Petrochem. Mfrs. Ass'n v. Corey, 2015 WL 4872639 (E.D.Cal. Aug. 13, 2015).

defendants and defendant-intervenors filed the present motions to dismiss.[7]

## STANDARDS

Where the court lacks subject-matter jurisdiction, the action must be dismissed. Fed. R. Civ. P. 12(b)(1). The party seeking to invoke the subject-matter jurisdiction of the court bears the burden of establishing that such jurisdiction exists. Stock W., Inc. v. Confederated Tribes of the Colville Reservation, 873 F.2d 1221, 1225 (9th Cir. 1989). The court may hear evidence regarding subject-matter jurisdiction and resolve factual disputes where necessary: "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the [court] from evaluating for itself the merits of jurisdictional claims." Kingman Reef Atoll Invs., LLC v. United States, 541 F.3d 1189, 1195 (9th Cir. 2008).

Where the plaintiff "fails to state a claim upon which relief can be granted," the court must dismiss the action. Fed. R. Civ. P.

---

[7] State Intervenors also request judicial notice of certain documents. State Intervenors' First Req. Judicial Notice Exs. A-G; State Intervenors' Second Req. Judicial Notice Exs. H-L. Additionally, defendants attach materials to their opening and reply briefs. Defs.' Mot. Dismiss Appx.; Defs.' Reply to Mot. Dismiss Exs. 1-7. Plaintiffs do not object to and, in some instances, rely on these documents. Because they are part of the public record and/or incorporated by reference into the complaint, the Court considers these materials, to the extent relevant, in evaluating the present motions. United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted); Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (citations omitted).

12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). For the purposes of a Fed. R. Civ. P. 12(b)(6) motion, the complaint is liberally construed in favor of the plaintiff and its allegations are taken as true. Rosen v. Walters, 719 F.2d 1422, 1424 (9th Cir. 1983). Bare assertions that amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." Ashcroft v. Iqbal, 556 U.S. 662, 680-81 (2009). Rather, to state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. Starr v. Bacca, 652 F.3d 1202, 1216, reh'g en banc denied, 659 F.3d 850 (9th Cir. 2011).

Judgment on the pleadings is proper where "the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1550 (9th Cir. 1990); Fed. R. Civ. P. 12(c). "Rule 12(c) is functionally identical to Rule 12(b)(6) and [the] same standard of review applies to motions brought under either rule." Cafasso, U.S. ex rel. v. General Dynamics C4 Sys., Inc., 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (citation and internal quotations omitted).

**DISCUSSION**

The central issue to be decided in this case is whether the Oregon Program violates federal law. Defendants argue that dismissal of plaintiffs' Commerce Clause claims is required because they are precluded by <u>Rocky Mountain</u>, fail at the pleadings level, and/or are not yet ripe. In addition, defendants contend that plaintiffs cannot state an express preemption claim because the EPA did not affirmatively preclude state regulation of methane. Defendants also assert that plaintiffs' conflict preemption claim fails because prudential standing is lacking and the RFS and EISA are in harmony with the Oregon Program.[8]

## I. First Claim: Discrimination

Plaintiffs allege that the Oregon Program discriminates in purpose and effect, as well as facially, "by attempting to regulate and control economic conduct occurring outside the borders of Oregon, including the extraction, production and distribution of transportation fuels." Compl. ¶¶ 4, 107-19.

The Commerce Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." <u>Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State</u>

---

[8] To the extent plaintiffs maintain that their allegations are sufficient or plausible despite the actual text of the relevant statues and regulations, or certain contradictory judicially noticeable facts, their argument is without merit. <u>Shwarz v. United States</u>, 234 F.3d 428, 435 (9th Cir. 2000).

of Or., 511 U.S. 93 (1994) (citation omitted). Known as the "dormant" Commerce Clause, this aspect is not a complete negative, as "the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local autonomy." Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008) (citations omitted). Accordingly, a "state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." Rocky Mountain, 730 F.3d at 1087 (citation and internal quotations omitted).

"The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Davis, 553 U.S. at 337-38 (citation and internal quotations omitted). Economic protectionism, or discrimination, "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Or. Waste Sys., 511 U.S. at 99. If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, strict scrutiny applies: the law is unconstitutional unless it "serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means." Maine v. Taylor, 477 U.S. 131, 138 (1986) (citation and internal quotations omitted). Absent discrimination, a law will be upheld "unless the burden imposed on [interstate] commerce is clearly excessive in

relation to the putative local benefits." <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137, 142 (1970).[9] "The party challenging the statute bears the burden of showing discrimination." <u>Black Star Farms, LLC v. Oliver</u>, 600 F.3d 1225, 1230 (9th Cir. 2010).

The Court notes, at the outset, that plaintiffs' discrimination claim is largely barred by on-point precedent: the Ninth Circuit held that the LCFS did not facially discriminate against out-of-state ethanol or petroleum, and did not discriminate in purpose or effect against out-of-state petroleum. <u>Rocky Mountain</u>, 730 F.3d at 1107. The only issue related to discrimination that falls outside <u>Rocky Mountain</u> is whether the Oregon Program discriminates in purpose or effect against out-of-state ethanol. <u>Rocky Mountain II</u>, 2014 WL 7004725 at *14-15 (citations omitted). While plaintiffs concede that <u>Rocky Mountain</u> "controls" certain issues, they nonetheless disagree and categorize its holdings as largely non-binding because it "involved a different state's officials, a different statute and regulations, a different record, and different statements." Pls.' Resp. to Mots. 2, 11, 18-19. Plaintiffs further seek to preserve their arguments for appeal, such that the Court will address all aspects of their

---

[9] Plaintiffs neither argue nor allege that the Oregon Program fails under the balancing test articulated in <u>Pike</u>. <u>See generally</u> Compl.; Pls.' Resp. to Mots.; <u>see also</u> <u>Rocky Mountain II</u>, 2014 WL 7004725 at *15 n.16 (plaintiffs "abandon[ed] their <u>Pike</u> challenges to both the crude oil and ethanol provisions of the LCFS"). Therefore, the sole issue is whether the Oregon Program is discriminatory.

discrimination claim.

A.  Facial Discrimination

Plaintiff's assert that the Oregon Program is facially invalid because it discriminates against petroleum - by "assign[ing] petroleum a higher carbon intensity than ethanol and other Oregon biofuels" - and Midwest ethanol - because "[t]he lookup tables consistently give higher scores to ethanol produced in the Midwest than to ethanol produced using the same process in Oregon." Pls.' Resp. to Mots. 16-18 (citing Compl. ¶¶ 55-59, 66-80).

Initially, plaintiffs do not meaningfully address how petroleum and ethanol are similarly situated or cite to any well-pleaded factual allegations to that effect. See generally Compl.; Pls.' Resp. to Mots.; see also General Motors Corp. v. Tracy, 519 U.S. 278, 298-99, 310 (1997) (when the alleged discrimination involves "entities [that] provide different products, as here, there is a threshold question whether the companies are indeed similarly situated for constitutional purposes"); Rocky Mountain, 730 F.3d at 1084-94 (analyzing ethanol and petroleum separately because "[c]rude oil presents different climate challenges from ethanol and other biofuels . . . [if a state] is to successfully [counter] a trend towards increased GHG output and rising world temperatures, it cannot ignore the real factors behind GHG emissions"); State Intervenors' Reply to Mot. Dismiss 8-9 ("[i]n the transportation fuel context, courts have traditionally considered ethanol to compete with ethanol and
Page 12 - OPINION AND ORDER

petroleum to compete with petroleum") (collecting cases).[10] Thus, to the extent they phrase it broadly to encompass both fuels, plaintiffs' claim fails at the pleadings level.

In any event, the fundamental premise of plaintiffs' claim is that the only fuels benefitting from the Oregon Program originate in Oregon. Plaintiffs therefore ignore significant segments of the market and instead ask this Court to assume that the pertinent comparison consists of Oregon biofuels,[11] on the one hand, and out-of-state petroleum and Midwest ethanol, on the other. See, e.g., Pls.' Resp. to Mots. 12. The Ninth Circuit, however, expressly rejected this attempt at "selective comparison, which excludes relevant [competing] fuel pathways" and held that discrimination

---

[10] Although defendants and State Intervenors raise this issue as a basis for dismissal, plaintiffs respond solely by pointing to, and misquoting, the complaint's allegations. Pls.' Resp. to Mots. 17 n.9 (citing Compl. ¶ 58). This is especially problematic given that compliance with the Oregon Program can be achieved exclusively through the purchase of credits, such that nothing precludes plaintiffs from continuing to produce and import diesel/petroleum in lieu of fuels with lower carbon intensities. See Defs.' Reply to Mot. Dismiss Ex. 2, at 8 ("the low carbon fuel standards would not mandate the use of any specific fuel"); Defs.' Reply to Mot. Dismiss Ex. 3, at 1 ("[t]o meet the [annual clean fuel] standards, regulated parties would select the strategy that works best for them [which could mean merely] purchasing clean fuel credits from providers of clean fuels").

[11] Biofuels include ethanol and biodiesel; nevertheless, the Court's analysis focuses exclusively on ethanol, as plaintiffs fail to allege any facts concerning biodiesel produced either inside or outside of Oregon, beyond observing that Oregon biodiesel "already meet[s] the proposed average annual carbon intensity." Compl. ¶ 58; see also Or. Admin. R. 340-253-8040 (Table 4) (all biodiesels have average carbon intensities below the annual fuel standard).

claims, whether premised on ethanol or petroleum, must be viewed "in context of the full market." <u>Rocky Mountain</u>, 730 F.3d at 1088-90, 1099.

Like the LCFS, the Oregon Program is not facially discriminatory because it distinguishes among fuels based on lifecycle GHG emissions, not origin or destination. In fact, the Oregon Program assigns twelve out-of-state ethanol pathways carbon intensities lower than the value plaintiffs' allege confers discriminatory benefits. <u>Id.</u> at 1089-96; Or. Admin. R. 340-253-8030 (Table 3); <u>see also</u> Compl. ¶ 70 (recognizing that an ethanol produced in California obtains the same benefits under the Oregon Program as those produced in Oregon). These twelve lower pathways represent biofuels from outside of Oregon; seven are expressly identified as from California and Brazil, and the remaining five correspond to ethanols from the Midwest. Or. Admin. R. 340-253-8030 (Table 3); <u>see also</u> <u>Rocky Mountain</u>, 730 F.3d at 1084, 1090 ("the lowest ethanol carbon intensity values, providing the most beneficial market position, have been for pathways from the Midwest and Brazil"). As such, the Oregon Program does not facially discriminate against out-of-state ethanol.

Assuming that biofuels and petroleum compete in the same market, the fact that the Oregon Program assigns lower carbon-intensity values to in-state and out-of-state biofuels than to petroleum is not indicative of discrimination. Petroleum's higher carbon intensity values exist for a legitimate, nondiscriminatory

reason:

> [c]orn and sugarcane absorb carbon dioxide as they grow, offsetting emissions released when ethanol is burned. By contrast, the carbon in crude oil makes a one-way trip from the Earth's crust to the atmosphere. For crude oil and its derivatives, emissions from combustion are largely fixed, but emissions from production vary significantly. As older, easily accessible sources of crude are exhausted, they are replaced by newer sources that require more energy to extract and refine, yielding a higher carbon intensity than conventional crude oil. As extraction becomes more difficult, emissions from crude oil will only increase, but [the state] expects that fuels with carbon intensity values fifty to eighty percent lower than gasoline will be needed to meet its emissions-reduction targets. No matter how efficiently crude oil is extracted and refined, it cannot supply this level of reduction. To meet [the state's] goals, the development and use of alternative fuels must be encouraged.

Rocky Mountain, 730 F.3d at 1084-85.

Moreover, it is undisputed that Oregon does not produce any petroleum in-state. Pls.' Resp. to Mots. 17-18 (citing Compl. ¶¶ 57-58); see also Exxon Corp. v. Governor of Md., 437 U.S. 117, 125, reh'g denied, 439 U.S. 884 (1978) (because the state's "entire gasoline supply flows in interstate commerce [as] there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be meritless"); see also Rocky Mountain, 730 F.3d at 1089 ("a regulation is not facially discriminatory simply because it affects in-state and out-of-state interests unequally"). Under Rocky Mountain and Exxon Corp., facial discrimination against out-of-state petroleum would not transpire even if it were ultimately displaced by biofuels in the Oregon market because "successfully promot[ing] low-carbon-

intensity fuels" requires the consideration of "factors [that] bear on the reality of GHG emissions," including "location, but only to the extent that location affects the actual GHG emissions attributable to a default pathway." Rocky Mountain, 730 F.3d at 1089-93.

Finally, the cases plaintiffs rely on are distinguishable. See Pls.' Resp. to Mots. 16-17 (citing Bacchus Imps., Ltd. v. Dias, 468 U.S. 263 (1984); Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977); New Energy Co. of Ind. v. Limbach, 486 U.S. 269 (1988)). Two of these cases focused primarily on non-facial discrimination. See, e.g., Bacchus, 468 U.S. at 268-73 (observing "that the tax exemption here at issue seems clearly to discriminate on its face against interstate commerce" but ultimately basing its ruling on the statute's purpose and effect); Hunt, 432 U.S. at 350-52 (describing the challenged statute's facial neutrality and instead striking it down due to its discriminatory effect). Regardless, the law invalidated in Bacchus limited the state's liquor excise tax exemption to two products manufactured exclusively in-state. Bacchus, 468 U.S. at 265-66. In contrast, under the Oregon Program, both in-state and out-of-state products can earn, and have earned, lower carbon intensity values, and regulated parties are not required to import or manufacture any specific fuel in order to achieve compliance. See Rocky Mountain, 730 F.3d at 1100 (distinguishing Bacchus in relation to the plaintiffs' petroleum-based discriminatory purpose claim).

Hunt and New Energy are similarly distinct. Plaintiffs cite to these cases for the proposition that an otherwise-unconstitutional statute is not saved because it favors certain out-of-state products in addition to in-state products. Pls.' Resp. to Mots. 16. Unlike the Oregon Program, the state laws challenged in Hunt and New Energy were not the most beneficial towards out-of-state products. Hunt, 432 U.S. at 350-52; New Energy, 486 U.S. at 271-75; see also Rocky Mountain, 730 F.3d. at 1092 (distinguishing Hunt in relation to the plaintiffs' ethanol-based facial discrimination claim). Further, unlike the plaintiffs in Hunt, plaintiffs here identify no competitive and economic advantages they earned and that the Oregon Program eliminates. Indeed, on its face, the Oregon Program rewards all investment in innovative fuel production, irrespective of where that innovation occurs. Defendants' and defendant-intervenors' motions are granted as to plaintiffs' facial discrimination claim.

B. Discriminatory Purpose

Plaintiffs contend that the Oregon Program "was enacted to [favor] Oregon's 'home-grown' biofuels industry against the petroleum and ethanol industries of other states." Pls.' Resp. to Mots. 8 (citing Compl. ¶¶ 71-84). Plaintiffs cite to statements made by state lawmakers, as well as DEQ committee members and officials, to support their assertion of discriminatory purpose. Id. at 8-11.

Plaintiffs' claim fails for three reasons. First, plaintiffs

Page 17 - OPINION AND ORDER

ignore the actual stated purpose of the Oregon Program, which is to "reduce Oregon's contribution to the global levels of [GHG] emissions and the impacts of those emissions in Oregon" by "reduc[ing] the amount of lifecycle [GHG] emissions per unit of energy by a minimum of 10 percent below 2010 levels over a 10-year period." Or. Admin. R. 340-253-0000(1)-(3); see also Rocky Mountain, 730 F.3d at 1098 (court "will assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [it] to conclude that they could not have been a goal of the legislation") (citation and internal quotations omitted); Perry v. Commerce Loan Co., 383 U.S. 392, 400 (1966) ("[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes"). Plaintiffs also ignore that the metric by which GHG emissions are measured applies evenhandedly; the dispositive inquiry is a fuel's carbon intensity, which correlates to the fuel's contribution to climate change, not its origin. Rocky Mountain, 730 F.3d at 1089-90. In other words, the purpose and design of the Oregon Program are nondiscriminatory on their face.

Second, the comments plaintiffs rely on are provided out of context. When read in their entirety, the documents in which these remarks appear reinforce that the purpose of the Oregon Program is to reduce GHG emissions. Compare Compl. ¶¶ 71-84 (excerpted comments), with Defs.' Reply to Mot. Dismiss Exs. 1-7 (comments

Page 18 - OPINION AND ORDER

provided in context). In any event, the hope of state officials that, in effectuating the legitimate goal of lowering GHG emissions, the Oregon Program benefits the local economy is insufficient to evince a discriminatory purpose. See <u>Valley Bank of Nev. v. Plus Sys., Inc.</u>, 914 F.2d 1186,1193-96 (9th Cir. 1990) (regulation that "advances . . . legitimate state interests" and "applies evenhandedly certainly passes muster under the commerce clause"; the "predictable concern" from state politicians for their own residents "does not rebut the evenhandedness of the legislation's plain language").

Third, the plaintiffs in <u>Rocky Mountain</u> based their discriminatory purpose claim on similar, isolated comments made by California lawmakers. <u>Rocky Mountain</u>, 730 F.3d at 1089-1101; <u>see also</u> Defs.' Reply to Mot. Dismiss 11-12 n.4 (summarizing comparable statements made by California officials highlighting the LCFS' benefits to in-state industries) (citations omitted). In holding that the LCFS did not have a discriminatory purpose, the Ninth Circuit explicitly acknowledged the "few quotes from an expansive record" cited by plaintiffs but nonetheless held that they "do not plausibly relate to a discriminatory design and are 'easily understood, in context, as economic defense of a [regulation] genuinely proposed for environmental reasons.'" <u>Rocky Mountain</u>, 730 F.3d at 1100 n.13 (quoting <u>Minnesota v. Clover Leaf Creamery, Co.</u>, 449 U.S. 456, 463 n.7 (1981)). As discussed herein, any claim of a protectionist purpose is belied by the fact that the Oregon Program

Page 19 - OPINION AND ORDER

provides advantages, in terms of lower carbon intensity values, to numerous out-of-state fuels. See, e.g., Or. Admin. R. 340-253-8030 (Table 3). Defendants' and defendant-intervenors' motions are granted as to plaintiffs' discriminatory purpose claim.

C.   Discriminatory Effect

Plaintiffs allege that the Oregon Program creates a "'commercial disadvantage' for petroleum and ethanol from outside Oregon [by] requir[ing] regulated parties to comply with the standard for carbon intensity, and [assigning] lower carbon-intensity values to Oregon ethanol and other biofuels than to petroleum, and lower carbon-intensity values to Oregon ethanol than to identical Midwest ethanol." Pls.' Resp. to Mots. 13 (citing Compl. ¶¶ 55-57 and quoting New Energy, 486 U.S. at 274).[12]

As a preliminary matter, plaintiffs' base their opposition on the wrong standard. Whether actual evidence of differential treatment amongst in-state and out-of-state interests exists, as opposed to a commercial disadvantage, is the critical question. See Black Star, 600 F.3d at 1232 ("[c]ourts examining a 'practical effect' challenge must be reluctant to invalidate a state statutory

---

[12] In response to defendants' ripeness argument, which the Court does not find persuasive given the Oregon Program's imminent start date and the hardship that would result to the parties from withholding a decision, plaintiffs contend that "the question of the Oregon Program's effects is already clear"; yet, in other portions of their brief, plaintiffs argue the effects are unknown and that a "motion to dismiss in not an appropriate mechanism to test whether a party will ultimately prove facts underlying its well-pleaded claims." Compare Pls.' Resp. to Mots. 14, with id. at 31, 34.

scheme . . . simply because it might turn out down the road to be at odds with our constitutional prohibition against state laws that discriminate against Interstate Commerce [especially] where neither facial economic discrimination nor improper purpose is an issue"); see also New Energy, 486 U.S. at 274-76 (discrimination was "patent" such that an analysis of the statute's discriminatory effect was not necessary). As a result, to survive a motion to dismiss, a plaintiff must allege more than the existence of a commercial disadvantage, such as facts creating a reasonable inference that the challenged law has differing effects on similarly situated in-state and out-of-state entities.

Plaintiffs have not done so here; their only pleadings pertaining to this subject conclude that the Oregon Program "will have the intended discriminatory effect" due to its discriminatory design. Pls.' Resp. to Mots. 13. Yet the purported discriminatory design that plaintiffs object to generally required regulated parties to reduce the lifecycle GHG emissions of their fuels. See Compl. ¶¶ 55-58 (gasoline and "diesel importers would need to replace existing sources [with fuels that have] lower calculated carbon intensities or purchase credits from other parties to meet their annual average carbon intensity requirements").

Additionally, the essential tenants of plaintiffs' discriminatory effects claim are undermined by the plain language of the Oregon Program and Ninth Circuit precedent. The definition of a regulated party does not depend on the origin of the fuel. Or.

Admin. R. 340-253-0100(1). Likewise, the Oregon Program "does not base its treatment on a fuel's origin but on its carbon intensity." Rocky Mountain, 730 F.3d at 1089. As addressed in section I(A), the Oregon Program also does not grant preferential treatment to in-state biofuels over out-of-state petroleum and Midwest ethanol. Whatever effects the Oregon Program may ultimately have on Oregon's biofuels market, there are no plausible allegations demonstrating that out-of-state producers will be commercially disadvantaged or considerably burdened, as some of their biofuels are the most desirable from a carbon intensity standpoint and the Oregon Program mandates neither the use of any particular fuel nor a specific carbon intensity or origin. Defendants' and defendant-intervenors' motions are granted as to plaintiffs' first claim.

II.  Second Claim: Extraterritorial Legislation

Plaintiffs next allege that the Oregon Program "violates the United States Constitution by regulating interstate and foreign commerce that occurs wholly outside Oregon." Pls.' Resp. to Mots. 19 (citing Compl. ¶¶ 121-30).

The constitution, pursuant to either the dormant Commerce Clause or principles of structural federalism embodied therein, proscribes any "statute that directly controls commerce occurring wholly outside the boundaries of a State." Healy v. Beer Inst., 491 U.S. 324, 336 (1989); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 293 (1980). The extraterritoriality principle is rarely utilized and has been confined to three circumstances: price

control statutes, statutes that link prices paid in-state with those paid out-of-state, and statutes that discriminate against out-of-state commerce. <u>Rocky Mountain</u>, 730 F.3d at 1101-03.

Plaintiffs paint their current extraterritorial legislation claim as discrete from the claim that was reviewed and rejected by the Ninth Circuit because it is independently based on principles of interstate federalism. Nevertheless, plaintiffs recognize that, irrespective of its constitutional basis, any such claim is necessarily contingent upon a finding that the "Oregon Program regulates and attempts to control conduct that occurs in other states," as both "the Commerce Clause [and] principles of structural federalism [exist to] prohibit states from engaging in extraterritorial regulation." Pls.' Resp. to Mots. 19-21.

Accordingly, because the Ninth Circuit expressly held that the analogous LCFS "does not control conduct wholly outside the state," and is not "an impermissible extraterritorial regulation," plaintiffs' claim fails as a matter of law. <u>Rocky Mountain</u>, 730 F.3d at 1103-07; <u>see also</u> <u>Rocky Mountain II</u>, 2014 WL 7004725 at *13-14 (plaintiffs' proposed amendment - i.e. to add a claim alleging that the LCFS was unconstitutional under "principles of interstate federalism" - was barred by the law of the case doctrine because, per plaintiffs own admission, any such claim was premised on the fact that a state "may not apply its laws to commerce that takes place wholly outside of [its] borders, or seek to control commerce in other States") (citations and internal quotations and

Page 23 - OPINION AND ORDER

ellipses omitted); Am. Fuels, 2015 WL 4872639 at *9-12 (dismissing, without leave to amend, plaintiffs' extraterritorial regulation claim based on "principles of interstate federalism"). Defendants' and defendant-intervenors' motions are granted as to plaintiffs' second claim.

III. Third Claim: Express Preemption

Plaintiffs' also allege the Oregon Program is expressly preempted by section 211(c)(4)(A)(i) of the CAA and the RFGR, which found that "no control or prohibition relating to the GHG methane is necessary for transportation fuels." Compl. ¶¶ 131-36.

The Supremacy Clause gives Congress the power to preempt state law by, amongst other avenues, "withdraw[ing] specified powers from the States by enacting a statute containing an express preemption provision." Arizona v. United States, 132 S.Ct. 2492, 2500-01 (2012) (citation omitted). When a federal act contains an express preemption provision, the court's primary task is to "identify the domain expressly pre-empted by that language." Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996). The court "focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993).

The CAA authorizes the EPA to regulate fuels and their emissions. 42 U.S.C. § 7545. Under Section 211(c)(1), the EPA may regulate a fuel if that fuel or its emission product "causes, or contributes, to air pollution . . . that may reasonably be

Page 24 - OPINION AND ORDER

anticipated to endanger the public health or welfare." 42 U.S.C. §

7545(c)(1). The CAA also includes an express preemption provision

under section 211(c)(4):

> no State (or political subdivision thereof) may prescribe
> or attempt to enforce, for purposes of motor vehicle
> emission control, any control or prohibition respecting
> any characteristic or component of a fuel or fuel
> additive in a motor vehicle or motor vehicle engine -
>
> (i) if the [EPA] has found that no control or prohibition
> of the characteristic or component of a fuel or fuel
> additive under paragraph (1) is necessary and has
> published his finding in the Federal Register, or
>
> (ii) if the [EPA] has prescribed under paragraph (1) a
> control or prohibition applicable to such characteristic
> or component of a fuel or fuel additive, unless State
> prohibition or control is identical to the prohibition or
> control prescribed by the [EPA].

42 U.S.C. § 7545(c)(4)(A). Thus, subsection (ii), which is not at

issue in this case, is preemption by affirmative, positive EPA

regulation, whereas subsection (i) is preemption by affirmative,

negative EPA regulation. See 62 Fed. Reg. 10,690, 10,693

("[s]ection 211(c)(4) applies only where EPA has affirmatively

decided to regulate a particular fuel characteristic or component,

or has affirmatively found that no such regulation is necessary").

Section 211(k) of the CAA, in turn, requires the EPA to

control fuel to achieve the "greatest reduction in emissions of

ozone forming volatile organic compounds . . . through the

reformulation of conventional gasoline." 42 U.S.C. § 7545(k)(1)(A).

In 1994, the EPA issued the RFGR, the purpose of which is "to

improve air quality by requiring that gasoline be reformulated to

reduce motor vehicle emissions of toxic and tropospheric
ozone-forming compounds, as prescribed by section 211(k)(1)." 59
Fed. Reg. 7716. To meet the obligations of section 211(k)(1), the
RFGR positively and exclusively regulates ozone-forming volatile
organic compounds ("VOC"), such that states are expressly preempted
from setting different VOC restrictions. Id. at 7722-23, 7809; 42
U.S.C. § 7545(c)(4)(A)(ii). The EPA concluded, in plaintiffs' own
words, that methane was "excluded from regulation under Sections
211(c) and 211(k)" because it did not pose a sufficient threat to
the public health or welfare. Pls.' Resp. to Mots. 23 (citations
omitted). Specifically, the EPA found that "methane would be
excluded from the definition of VOC on the basis of its low
reactivity." 59 Fed. Reg. at 7722-23.

As such, the plain language of the RFGR did not affirmatively
find that no control or prohibition of methane was necessary.
Rather, the EPA determined only that methane was not an
ozone-forming VOC under section 211(k) and therefore not subject to
regulation under section 211(c)(1). In other words, the EPA's sole
finding relating to preemption was under section 211(c)(4)(A)(ii) -
i.e. that its standard for ozone-forming VOCs should preempt non-
identical state regulation. See 59 Fed. Reg. at 7809 ("dissimilar
State [VOC] controls [are] preempted"). Because the RFGR's limited
discussion of methane says nothing about the need for an
affirmative, negative regulation pursuant to section
211(c)(4)(A)(i), this fuel component is not covered under the CAA's

express preemption provision.

This reading is consistent with the recognition that air pollution prevention is within the states' traditional authority – for which "there is a general presumption against preemption" absent a "clear and manifest" expression of intent by Congress. Oxygenated Fuels Ass'n, Inc. v. Davis, 331 F.3d 665, 668-73 (9th Cir. 2003) (citations and internal quotations omitted); see also 40 C.F.R. § 80.1 ("[n]othing in this part is intended to preempt the ability of State or local governments to control or prohibit any fuel or additive for use in motor vehicles and motor vehicle engines which is not explicitly regulated"); 62 Fed. Reg. at 10,693 ("as a policy matter, EPA's decision to regulate [certain fuel components in reformulated gasoline] areas did not encompass a determination that states should not or need not regulate that characteristic outside of those areas"). The CAA's "sweeping and explicit" savings clause is further textual evidence that where, as here, the EPA has not made an affirmative finding that no control is necessary, the states retain authority to regulate air pollutants. Exxon Mobil Corp. v. Envtl. Prot. Agency, 217 F.3d 1246, 1255 (9th Cir. 2000) (citing 42 U.S.C. § 7416).

Moreover, as State Intervenors observe, the EPA has spoken unequivocally when it intends to invoke section 211(c)(4)(A)(i). State Intervenors' Mot. Dismiss 16. For instance, in relation to fuel oxygen content, the EPA "propos[ed] to issue a finding that 'no control or prohibition [is] necessary' under section

211(c)(4)(A)(i)," with the "effect [being] to preempt state controls." 57 Fed. Reg. 47,849, 47,849. In contrast, the RFGR contains no such language concerning methane, or any other component of fuel, and instead only speaks to VOC controls. 59 Fed. Reg. at 7809.

In sum, plaintiffs erroneously equate the EPA's finding that methane is not affirmatively, positively preempted by the RFGR with an affirmative, negative determination that no control or prohibition of methane is necessary.[13] In so doing, plaintiffs ignore the possibility, embodied in the plain language of the statute, that the EPA may decline to make and publish the finding required by section 211(c)(4)(A)(i), thereby allowing states to regulate that fuel characteristic or component as they choose. Defendants' and defendant-intervenors' motions are granted as to plaintiffs' third claim.

---

[13] The EPA made an Endangerment Finding in 2009 that methane is a GHG which "may reasonably be anticipated to endanger public health or welfare." 74 Fed. Reg. 66,496, 66,497. This is essentially the same standard that triggers the EPA's authority to regulate under section 211(c)(1). 42 U.S.C. § 7545(c)(1). Contrary to plaintiffs' assertion, the fact that the Endangerment Finding "was issued under Section 202 of the CAA, which governs vehicle standards - not Section 211(c), which governs fuel standards," does not render it irrelevant. Pls.' Resp. to Mots. 27 (emphasis removed). The Court nonetheless agrees with plaintiffs that the Endangerment Finding does not amend the RFGR; rather, the Endangerment Finding speaks to the hazards of methane that have been discovered over the past fifteen years such that, even if the EPA had found it unnecessary to control emissions from this component in 1994, it subsequently reversed course in light of newfound scientific evidence. 79 Fed. Reg. 1430, 1455.

IV. <u>Fourth Claim: Conflict Preemption</u>

Lastly, plaintiffs allege that the "Oregon Program conflicts with and stands as an obstacle to the purposes and goals of the [EISA, RFS, and] Energy Policy Action of 2005" because it "is designed to close Oregon as a market for certain renewable fuels (in particular, certain forms of corn ethanol) produced in existing refineries necessary to meet national renewable fuel standards set by Congress." Compl. ¶¶ 137-45.

"[S]tate laws are preempted when they conflict with federal law," including instances "where compliance with both federal and state regulations is a physical impossibility [or] where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Arizona</u>, 132 S.Ct. at 2501 (citations and internal quotations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." <u>Id.</u> (citation and internal quotations omitted).

Section 211(o) of the CAA sets forth the RFS, which was modified in 2007 by the EISA. 42 U.S.C. § 7545(o). The purpose of the RFS is

> to ensure that transportation fuel sold or introduced
> into commerce in the United States (except in
> noncontiguous States or territories), on an annual
> average basis, contains at least the applicable volume of
> renewable fuel, advanced biofuel, cellulosic biofuel, and
> biomass-based diesel, determined in accordance with
> subparagraph (B) and, in the case of any such renewable

fuel produced from new facilities that commence
construction after December 19, 2007, achieves at least
a 20 percent reduction in lifecycle greenhouse gas
emissions compared to baseline lifecycle greenhouse gas
emissions.

42 U.S.C. § 7545(o)(2)(A)(i).[14]

As a threshold matter, plaintiffs' lack prudential standing as
they do not contend to generate or sell the type of biofuel the
Oregon Program allegedly penalizes, or that their interests are
closely aligned with those whose rights are at issue. Critically,
plaintiffs do not assert that they or any of their members own or
sell fuel from exempted biofuel plants; plaintiffs also do not
allege any hindrance to the exempted biofuel facilities' ability to
protect their own interests. Pls.' Resp. to Mots. 35 (citing Compl.
¶¶ 8-10, 17-20); see also State Intervenors' Mot. Dismiss 20
(noting plaintiffs "oppose[d] the very type of mandate [they] claim
Congress created and with which [they] allege [the Oregon] Program
conflicts," and that several ethanol "associations are plaintiffs
in one of the consolidated Rocky Mountain cases") (citations
omitted). Given these pleading deficiencies, in conjunction with
plaintiffs' failure to point to any additional facts that might

---

[14] In opposing dismissal, plaintiffs cite to a different
provision of the EISA, which does not concern the RFS, as
defining the RFS' purpose. Compare Pls.' Resp. to Mots. 30
(citing EISA § 806, codified at 42 U.S.C. § 17285), with Compl.
¶¶ 104-05 (citing EISA § 202, codified at 42 U.S.C. §
7545(o)(2)). Assuming its relevance to the Court's preemption
analysis, that provision espouses many compatible goals, all of
which relate to increasing the United States' reliance on
"domestic renewable resources" and "increas[ing] [the] use of
renewable energy." 42 U.S.C. § 17285.

confer subject-matter jurisdiction, the Court concludes that the fourth claim is premised on the rights of non-partes - namely, those who produce qualifying renewable fuels in facilities constructed pre-December 2007. See Allen v. Wright, 468 U.S. 737, 751 (1984) (the court lacks subject-matter jurisdiction, due to prudential limitations, where a plaintiff "rais[es] another person's legal rights"); see also Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 15 n.7 (2004) (prudential standing limitations exist to ensure "that the most effective advocate of the rights at issue is present to champion them") (citations and internal quotations omitted).

Irrespective of subject-matter jurisdiction, plaintiffs' allegations are implausible in four respects. First, plaintiffs maintain "that Section 211(o) was enacted to ensure a continued market for ethanol from existing ethanol plants." Pls.' Resp. to Mots. 30-31. Yet the expressly stated purpose and intended effects of the RFS is to increase the United States' reliance on renewable fuel sources and reduce GHG emissions. 42 U.S.C. § 7545(o)(2)(A)(i). Because section 211(o)(2)(A)(i) makes no mention of ensuring a market for then-existing facilities, the fact that Congress elected to exempt such facilities from the requirement that certain fuels achieve a 20% reduction in lifecycle GHG emissions does not confer upon them a preferred or dominant status.

Contrary to plaintiffs' assertion, the volume requirements for renewable fuel set in section 211(o)(2)(B) do not include a minimum

amount that must be met with corn ethanol generally, let alone from corn ethanol produced in facilities constructed before December 2007; this statute simply articulates applicable volumes of renewable fuel required for the calendar years of 2006 through 2011. 42 U.S.C. § 7545(o)(2)(B); see also 42 U.S.C. § 7545(o)(1)(B)(i) ("advanced biofuel," the use of which is encouraged under the RFS, "means renewable fuel, other than ethanol derived from corn starch"). The Oregon Program is also not an EPA regulation, such that the anti-geographic restriction provision embodied in section 211(o)(2)(A)(iii) is not implicated. See 42 U.S.C. § 7545(o)(2)(A)(iii) (speaking only to the EPA's ability to issue "regulations . . . under clause (i) [that] restrict geographic areas in which renewable fuel may be used").

Second, both the EISA's savings clause and legislative history reflect that Congress did not intend to preempt state regulation of transportation fuels. As part of its RFS rule-making, the EPA rejected one commenter's suggestion that the RFS should "preempt state programs designed to address carbon content and lifecycle analysis of fuels," including "state low carbon fuel standards," explaining that "[i]ssues associated with State LCFS programs . . . are not germane to the final RFS program." State Intervenors' First Req. Judicial Notice Ex. G, at 6-7[15]; see also id. at 4

---

[15] Because State Intervenors did not numeralize their exhibits, the Court refers to the page numbers assigned in the docket.

("these [RFS] thresholds do not constitute a specific control on [GHGs] for transportation fuels (such as a low carbon fuel standard)"). In fact, the EPA saw no conflict between state low carbon fuel standards and the RFS. See id. at 7 ("where possible [the EPA has] attempted to structure the RF[S] program so as to be compatible with existing State LC[F]S programs, including coordination on lifecycle modeling").

The EISA's savings clause, in turn, specifies that "nothing in the amendments made by this title to section 211(o) of the [CAA] shall be construed as superseding, or limiting, any more environmentally protective requirement under . . . any other provision of State or Federal law or regulation."[16] EISA § 204(b), Pub. L. No. 110-140. While plaintiffs are correct that a savings clause does not necessarily bar conflict preemption principles, this case presents no actual discord between the EISA, RFS, and Oregon Program. See Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 854 (9th Cir. 2002) (as amended) (where a savings clause

_____

[16] Plaintiffs' assertion that the Oregon Program is "[not] more environmentally protective" because it "may instead increase GHG emissions (or at the very least hide them)" is both unavailing and insufficient to preclude application of the EISA's savings clause. Pls.' Resp. to Mots. 34; see also Rocky Mountain, 730 F.3d at 1082 (describing the LCFS as "starting to work as intended," while noting that "[t]here is growing scientific and public consensus that the climate is warming and that this warming is to some degree caused by anthropogenic GHG emissions") (citations omitted). This is especially true in light of the fact that they do not make any allegations regarding this issue in the complaint. See generally Compl.

exists, state law is preempted only "to the extent that actual conflict persists between state and federal policies"); see also State ex rel. Stenehjem v. FreeEats.com, Inc., 712 N.W.2d 828, 841 (N.D.), cert. denied, 549 U.S. 953 (2006) (distinguishing Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861 (2000), and other conflict preemption cases, which involved "inconsistent and conflicting preemption provisions and savings clauses within the federal statutes," from one in which "an express provision explicitly provid[es] that nothing in the federal statute shall preempt any State law on the precise subject matter involved in the case") (internal quotations omitted).

Third, as addressed in section I, the Oregon Program neither "penalize[s] ethanol produced in existing [Midwest] ethanol plants" nor renders these plants "[un]able to export their fuels to Oregon." Pls.' Resp. to Mots. 30. Aside from the fact that plaintiffs' complaint is silent as to the carbon intensities of the ethanols generated from these unspecified, exempted plants, Midwestern producers have obtained some of the most favorable treatment under the Oregon Program.

Fourth, the compliance scenarios cited by plaintiffs in opposing dismissal do not "predic[t] Oregon's ending its importation of fuels from existing Midwestern ethanol plants." Pls.' Resp. to Mots. 30. As a preliminary matter, these scenarios are neither predictions nor do they provide any evidence of future market conditions. See State Intervenors' Second Req. Judicial

Notice Ex. I, at 3 (compliance scenarios "should not be confused with IFC market forecasts"). Rather, ongoing market conditions and fuel availability, amongst other factors, will determine how compliance occurs. See, e.g., Def.'s Reply to Mot. Dismiss Ex. 5, at 17. Regardless, the compliance scenarios merely demonstrate that one category of ethanol, labeled "Corn, MW," may drop off in 2019, after an initial increase in 2017 and 2018. State Intervenors' Second Req. Judicial Notice Ex. I, at 23. This category of ethanol, however, is defined as corn ethanol from "conventional processes," such that it possesses a higher average carbon intensity. Id. at 13-15. Notably, this is not the only kind of corn ethanol produced by Midwestern plants. Or. Admin. R. 340-253-8030 (Table 3); Rocky Mountain, 730 F.3d at 1084; State Intervenors' Second Req. Judicial Notice Ex. L, at 7, 11. Thus, these scenarios show conventional, higher-carbon corn ethanol from the Midwest being replaced in Oregon's market by other types of corn ethanol, several of which are also produced in the Midwest, as well as some sugar cane-based fuels from Brazil. Given the actual tone and content of these scenarios, combined with the fact that compliance can be achieved exclusively through purchasing credits, plaintiffs' conclusion that the Oregon Program will shutter the state's market to Midwest ethanol is not entitled to the presumption of truthfulness. Defendants' and defendant-intervenors' motions are granted as to plaintiffs' fourth claim.

**CONCLUSION**

State Intervenors' first and second requests for judicial notice (docs. 53, 68) are GRANTED. Defendants' motion to dismiss (doc. 51), State Intervenors' motion to dismiss (doc. 52), and Conservation Intervenors' motion for judgment on the pleadings (doc. 54) are also GRANTED. Accordingly, the parties' requests for oral argument are DENIED as unnecessary. This case is DISMISSED.

IT IS SO ORDERED.

Dated this 23rd day of September 2015.

_____
Ann Aiken
United States District Judge